IN THE SUPREME COURT OF NORTH CAROLINA

No. 68A20

Filed 11 December 2020

IN THE MATTER OF: A.K.O. and A.S.O.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 2 December 2019 by Judge Dennis J. Redwing in District Court, Cherokee County. This matter was calendared for argument in the Supreme Court on 23 November 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Elizabeth Myrick Boone for petitioner-appellee Cherokee County Department of Social Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad Litem.*

*J. Thomas Diepenbrock for respondent-appellant mother.*

*Dorothy Hairston Mitchell for respondent-appellant father.*

NEWBY, Justice.

Respondents appeal from the trial court's orders terminating their parental rights to A.K.O. and A.S.O. ("Alyson" and "Adam").[1] After careful review, we affirm in part, vacate in part, and remand to the trial court to reconsider Adam's age of 17 years old, reweigh his request to keep respondents' parental rights intact with whom

---

[1] Pseudonyms are used in this opinion to protect the juveniles' identity and for ease of reading.

he had a strong bond, and to reevaluate guardianship for Adam as an alternative to termination of parental rights. Alyson, Adam's younger sister, was only nine years old at the time of the hearing, significantly younger than Adam; thus, our analysis regarding Adam is not applicable to Alyson.

On 31 March 2017, the Cherokee County Department of Social Services (DSS) received a report claiming that respondents were both in jail, and Alyson had not been in school that day. The reporter expressed concern because Alyson had stated that the family was homeless, and they were "going to somebody's old house that stinks." The reporter believed it to be an abandoned house. Social workers met with respondent-father at the Cherokee County Detention Center concerning the allegations. Respondent-father told social workers that he was not sure what was happening with the children because he had been in jail for the past week, but he informed social workers that he, along with respondent-mother and the two juveniles, had recently moved to Murphy, North Carolina and were living in his grandparents' house.

Social workers went to the grandparents' house in Murphy. Upon arriving at the house, they observed a significant amount of furniture, trash, clothes, broken glass, and other objects on the outside grounds. The items were stacked in large unorganized piles and had "a strong offensive pet like odor." The social workers knocked on the door, and it was answered by respondent-mother. The social workers informed respondent-mother of the report they received and told her they needed to

discuss it with her. Upon being admitted into the home, social workers found the house to be cluttered with trash, clothing, dishes, glasses, and other items. They also found three mattresses on the floor of the living room. On the mattresses were two unrelated males and the two juveniles. The two men and the two juveniles were wearing dirty and soiled clothing. The home had a pungent smell, and one of the social workers observed a dog urinate in the living room. The dog's urine was not cleaned up throughout the visit, and pet feces and urine spots could be found throughout the home. Additionally, the floor was falling in one of the bedrooms, and some rooms were so cluttered that social workers could not enter them.

Social workers asked if respondent-mother would be willing to take a drug screen, and respondent-mother agreed to complete one. At that time, she disclosed that she had taken prescription medication that had not been prescribed for her a couple of days beforehand. Respondent-mother was transported to the Health Department where she tested positive for methamphetamine, amphetamine, and THC. Respondent-mother subsequently admitted to "snorting meth a couple of days ago." Respondent-mother was asked about a safety resource placement for the children, but she was unable to identify a suitable placement that would be approved by DSS. Accordingly, DSS filed a petition alleging that Alyson and Adam were neglected and dependent juveniles and obtained nonsecure custody.

On 15 May 2017, the trial court adjudicated Alyson and Adam neglected and dependent juveniles. The trial court ordered that custody of the juveniles should

remain with DSS, granted respondents visitation, and ordered respondents to work on their case plan. The trial court subsequently set the permanent plan for the juveniles as reunification. Following a hearing held on 7 March 2018, the trial court entered an order changing the permanent plan to guardianship along with a concurrent plan of reunification.

In an order entered on 20 May 2019, the trial court found that respondents were not complying with their case plans. Specifically, the trial court found respondents did not have appropriate housing, had not made child support payments, and had missed half their visits with the juveniles since December 2018. The trial court additionally found that respondents were consistently testing positive for marijuana and methadone, and on 7 January 2019 their drug screens were positive for opioids and marijuana. Accordingly, the trial court changed the permanent plan for the juveniles to adoption with a concurrent plan of guardianship.

On 26 August 2019, DSS filed petitions to terminate respondents' parental rights on the grounds of neglect, failure to make reasonable progress, failure to pay support, and dependency. N.C.G.S. § 7B-1111(a)(1)–(3), (6) (2019). On 2 December 2019, the trial court entered orders in which it determined grounds existed to terminate respondents' parental rights based on the grounds alleged in the petitions. The trial court further concluded in separate dispositional orders that it was in Alyson's and Adam's best interests that respondents' parental rights be terminated. Accordingly, the trial court terminated their parental rights. Respondents appeal,

arguing that the trial court erred when it determined termination of their parental rights was in Alyson's and Adam's best interests.

A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under subsection 7B-1111(a) of the General Statutes. N.C.G.S. § 7B-1109(f). If the trial court finds grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest" based on the following factors:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a).

We review the trial court's determination of "whether terminating the parent's rights is in the juvenile's best interest," *id.*, for abuse of discretion, *In re Z.A.M.*, 374

N.C. 88, 99, 839 S.E.2d 792, 800 (2020). "Under this standard, we defer to the trial court's decision unless it is 'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.' " *Id.* at 100, 839 S.E.2d at 800 (quoting *Briley v. Farabow*, 348 N.C. 537, 547, 501 S.E.2d 649, 656 (1998)). We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence. *In re K.N.K.*, 374 N.C. 50, 57, 839 S.E.2d 735, 740 (2020). Dispositional findings not challenged by respondents are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 65 (2019).

I.

First, we consider whether the trial court abused its discretion by terminating respondents' parental rights to Adam. The trial court made a finding of fact indicating it considered Adam's age and took judicial notice of the findings of facts made at the adjudication hearing. The trial court also made the following findings concerning the factors set forth in N.C.G.S. § 7B-1110(a):

> 8. [Adam] is bonded with his current foster parents, their biological children, and their extended family.
>
> 9. [Adam's] foster family have extended family that are bonded with [Adam] and are interested in adopting [him].
>
> 10. That the court considered the testimony of [Adam] with regard to his bond with his sister [Alyson] and his forthright expression of his desires in this case.
>
> 11. That the [c]ourt admires [Adam] for his actions in trying to understand this situation and responding by making reasoned decisions on behalf of his sister [Alyson].

. . . .

15. That termination of the Respondent Parents' parental rights will aid in the accomplishment of the permanent plan of Adoption or Guardianship for [Adam], legally freeing [Adam] for adoption [or] guardianship.

16. That [Adam] testified that he would prefer Guardianship with the family in Alabama so he can remain with his sister, but wishes to maintain a relationship with the Respondent Parents and does not want their parental rights terminated.

17. That [Adam] testified that he wishes to keep his family name and wants to continue to have the Respondent Parents' names listed on all of his legal documents.

18. That [Adam] testified that he wanted to stay with and protect his sister.

19. The Respondent Parents testified to their desire to maintain a relationship with [Adam].

. . . .

21. Based upon the ongoing Neglect of [Adam] demonstrated by the Respondent Parents from at least March 31, 2017 to the present, there is a probability of repetition of the Neglect should [Adam] be returned to the home of the Respondent Parents.

22. The conduct of the Respondent Parents has been such as to demonstrate that they will not promote the healthy and orderly physical and emotional wellbeing of [Adam].

23. [Adam] is in need of a Permanent Plan of Care at the earliest age possible that can be obtained only by the severing of the relationship between [Adam] and the Respondent Parents by termination of the parents' parental rights.

Respondents challenge findings of facts 8, 9 and 15 in the trial court's order. Respondents both argue that there was no competent evidence to support findings of fact 8 and 9 that Adam had a bond with his foster family's extended relatives in Alabama. Respondents further challenge finding of fact 15, which states that termination of respondents' parental rights will aid in the accomplishment of the permanent plan of adoption or guardianship by "legally freeing [Adam] for adoption [or] guardianship." Respondents note that, due to his age, Adam's consent is required for him to be adopted. *See* N.C.G.S. § 48-3-601(1) (2019) (providing that a minor over the age of 12 must consent to adoption, unless consent is not required under N.C.G.S. § 48-3-603 (2019) and the trial court makes the necessary findings under that section). Here Adam clearly expressed his desire to not be adopted but rather to keep his biological parents' rights intact.

Findings of fact 8 and 9 are supported by competent evidence. During the dispositional hearing, DSS's Court Report was admitted into evidence without objection. In the report, DSS stated that Adam and Alyson had "spent holidays and vacations" with the family in Alabama and, "[d]uring these times, they have developed a bond with the family." This evidence supports the factual findings in that it permits a reasonable inference that Adam is bonded with the prospective adoptive family in Alabama. Consequently, we are bound by them on appeal. *See In re E.F.*, 375 N.C. 88, 91, 846 S.E.2d 630, 632 (2020).

We next consider respondents' challenges to finding of fact 15 concerning the need to terminate respondents' rights to aid in the accomplishment of the permanent concurrent plans of adoption or guardianship. Adam, just days away from his sixteenth birthday when the trial court entered its order, indicated that he does not wish to be adopted and prefers guardianship even though his permanent plan remains a concurrent plan of adoption or guardianship. While it is true that termination of respondents' parental rights would aid in the permanent plan of adoption, *see In re A.J.T.*, 374 N.C. 504, 512, 843 S.E.2d 192, 197 (2020), it is not legally necessary to accomplish the concurrent permanent plan of guardianship, *see* N.C.G.S. § 7B-600(a) (2019) (providing for appointment of guardians "when no parent appears in a hearing with the juvenile or when the court finds it would be in the best interests of the juvenile"). Thus, the trial court was incorrect in believing that termination of respondents' parental rights is necessary to free Adam for guardianship.

We next consider respondents' arguments that the trial court failed to make written findings regarding all the factors set forth in N.C.G.S. § 7B-1110(a). Respondent-father contends the trial court failed to address his bond with Adam, whereas respondent-mother asserts that the trial court failed to make written findings regarding her bond with Adam, as well as the likelihood of Adam being adopted.

Subsection 7B-1110(a) requires the trial court to consider all the factors but "does not, however, explicitly require written findings as to each factor," particularly when there was no conflict in the evidence regarding those factors. *In re A.U.D.*, 373 N.C. 3, 10, 832 S.E.2d 698, 702 (2019). Here it is uncontested that Adam had a bond with his parents. Adam testified that he had a bond with his father, and during closing arguments the attorney for DSS stated that Adam was bonded with his parents. It was also undisputed that Adam did not wish to be adopted and would not give his consent to being adopted, and therefore it was unlikely that he would be adopted. Thus, because these factors were uncontested, no written findings were necessary. *Id.* at 11, 832 S.E.2d at 703.

We further note that while the trial court may not have made explicit findings regarding the statutory factors set forth in N.C.G.S. § 7B-1110(a)(2) and (4), its remaining dispositional findings of fact demonstrate that it considered Adam's bond with his parents and the likelihood of his being adopted. In finding of fact 10, the trial court found that it had considered the "expression of [Adam's] desires in this case," meaning that Adam did not wish to be adopted. In finding of fact 16, the trial court noted Adam's testimony that he wished to maintain a relationship with his parents and did not want their rights terminated. Accordingly, we conclude that the trial court did not err by failing to make written findings of fact using the exact language contained in N.C.G.S. § 7B-1110(a).

Lastly, respondents argue that consideration of the statutory factors set forth in N.C.G.S. § 7B-1110(a) does not support termination of their parental rights. Specifically, respondents cite: (1) their bond with Adam; (2) the likelihood that he would not be adopted because he would not grant consent; (3) that termination of their parental rights was unnecessary to accomplish Adam's preferred disposition of guardianship; and (4) that due to Adam's age, there were few, if any, benefits to Adam being adopted. While generally the trial court's decision is well supported, it seems the trial court's decision to terminate respondents' parental rights was made under a mistake of law concerning guardianship.

First, it is undisputed that Adam had a bond with respondents, and it appears he especially had a strong bond with respondent-father. When considering the other factors set forth in N.C.G.S. § 7B-1110(a), however, the trial court's determination that termination of respondents' parental rights is in Adam's best interests seems to misapprehend the weight that should be given to Adam's consent to adoption, particularly given his age. While termination of respondents' parental right would technically aid in accomplishing the permanent plan of adoption, the trial court should not place undue emphasis on this statutory factor when Adam will not consent to adoption and is a much older juvenile.

Adam clearly expressed that did not wish to be adopted and would not give consent to being adopted. Here, just prior to the termination hearing, Adam wrote a letter to the judge who would preside over the hearing, in which he stated:

> I understand there is a family in Alabama who are willing to adopt my sister and provide guardianship for me. I understand that I have a choice, being over 12 years old, that I seek guardianship and **NOT** adoption. I prefer guardianship over adoption due to wanting to keep my last name, I want [respondents'] names to remain on legal documents, and I will be an adult in two years and will only return to Alabama to visit my biological sister. I am struggling to understand the benefits of adoption as I will be turning 18 in twenty-six months. When moving to Alabama I do not want to give up access to mom and dad. I want to be able to speak directly to my parents . . . unrestrained and unsupervised by others.

Adam is now 17 years old. Given Adam's well-reasoned objection to adoption, the trial court's unchallenged finding that Adam's interest in maintaining a relationship with respondents is reciprocated by respondents, as well as the fact that Adam is approaching the age of majority, there are few benefits to terminating respondents' parental rights. As a juvenile ages, the trial court should afford more weight to his wishes.

While Adam is unlikely to be able to return to respondents' home, other dispositional alternatives were available. The guardian *ad litem* advocated for placing Adam in guardianship rather than proceeding with adoption. Contrary to findings of fact 15 and 23, termination of respondents' parental rights is not necessary to place Adam in guardianship with the family in Alabama. *See* N.C.G.S. § 7B-600(a). Those findings suggest a misapprehension of the legal differences between adoption and guardianship. In such a situation, the proper remedy is to remand for reconsideration. *Cf. In re Estate of Skinner*, 370 N.C. 126, 146, 804 S.E.2d 449, 462

(2017) ("It is well-established in this Court's decisions that a misapprehension of the law is appropriately addressed by remanding the case to the appropriate lower forum in order to apply the correct legal standard."). As such, we vacate that portion of the order terminating respondents' parental rights to Adam and remand to the trial court to reconsider guardianship as a dispositional alternative, which does not require termination, and to give proper weight to Adam's age, his lack of consent to adoption, his bond with his parents, and the availability of a family that could be appointed as guardians.

II.

We next consider respondents' arguments concerning the order terminating their parental rights to Alyson. Respondents argue that the trial court failed to make a written finding of fact regarding the bond between Alyson and respondents. Respondent-mother argues that the matter should be remanded for further findings under N.C.G.S. § 7B-1110(a), whereas respondent-father asserts that because the trial court failed to consider all relevant statutory factors, the trial court abused its discretion by terminating his parental rights. We are not persuaded.

Explicit written findings regarding each of the factors set forth in N.C.G.S. § 7B-1110(a) are not required when there is no conflict in the evidence. *In re A.U.D.*, 373 N.C. at 10–12, 832 S.E.2d at 702–03. Here the guardian *ad litem* testified that Alyson had a bond with respondent-mother. The guardian *ad litem* described a visit between Alyson and respondent-mother as follows: "[Alyson] and her mom generally

will color, or they'll play a game on the phone, or yesterday they were playing a Heads Up! game and enjoying themselves. It was a nice visit." Additionally, a DSS Court Report from July 2018 stated that "the children and the respondent parents are well bonded." Alyson also wrote a letter to the presiding judge, which was admitted into evidence, in which she stated that she loved her prospective adoptive family and would like to live with them. Alyson further explained, "I would live with my parents but I know why I can't." It thus appears that the undisputed evidence shows Alyson had a bond with respondents. Even assuming *arguendo*, however, that the trial court erred by failing to make a finding regarding this dispositional factor, we would decline to find reversible error because it would only delay permanence for Alyson.

Here Alyson was only nine years old at the time of the hearing, significantly younger than Adam, and thus the same considerations are not applicable to Alyson. Specifically, Alyson's consent is not required for adoption. Additionally, the trial court made unchallenged findings that Alyson was bonded with her prospective adoptive parents, termination of respondents' parental rights would aid in the permanent plan of adoption, Alyson was in need of a permanent plan of care at the earliest age possible, and respondents' conduct had demonstrated that they would not promote Alyson's physical and emotional well-being. Furthermore, it is not contested that Alyson is likely to be adopted.

Therefore, we conclude the trial court appropriately considered the factors set forth in N.C.G.S. § 7B-1110(a) when determining Alyson's best interests and that the

trial court's determination that respondents' minimal bond with Alyson was outweighed by other factors was not manifestly unsupported by reason. We therefore hold the trial court's conclusion that termination of respondents' parental rights was in Alyson's best interests did not constitute an abuse of discretion and affirm the trial court's orders as to Alyson.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.